Estate of Salvatore Montagnino, Joseph Montanio, Executor v. Commissioner.
Estate of Montagnino v. Commissioner
Docket No. 6211-65.
United States Tax Court
T.C. Memo 1967-24; 1967 Tax Ct. Memo LEXIS 237; 26 T.C.M. (CCH) 133; T.C.M. (RIA) 67024; February 10, 1967
John L. Carey, 645-695 First Bank Bldg., South Bend, Ind., for the petitioner. Wayne I. Chertow, for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in estate tax in the amount of $88,034.58. The great bulk of all the decedent's assets comprising his gross estate as reported in the estate tax return was listed therein as jointly owned with his brother, Joseph Montanio. The principal question is whether the Commissioner erred in including the full value of such property in the gross estate rather than one-half thereof as reported in the return. Also in issue are the Commissioner's adjustments relating to the amount to be included in the gross estate in respect of a checking account, certain household goods and coins, and the includability *238 in the gross estate of an account in the name of decedent's brother as trustee for decedent. Findings of Fact Some of the facts have been stipulated, and, as stipulated, are incorporated herein by reference. Salvatore Montagnino (hereinafter sometimes referred to as the decedent) was born on December 25, 1894, in Italy, and died testate, a resident of Gary, Indiana, on May 14, 1963. The Federal estate tax return for the estate of decedent was filed with the district dirctor of internal revenue at Indianapolis, Indiana, on January 3, 1964. Decedent had two brothers, Joseph and Benamino, and three sisters, Teresa, Carmela, and Juiseppina. Decedent executed his will on July 17, 1956. Therein after making a bequest of $1,000 to Juiseppina, and bequests of $1 each to Benamino, Teresa, and Carmela, he gave the remainder of his estate to his brother Joseph. Joseph appears to have been the dominant figure among his siblings. He was born in Italy in 1889, and came to the United States in 1905. He had been a cobbler in Italy. He changed his name from Giusippe Montagnino to Joseph Montanio. After his arrival in the United States he resided in New York, Pennsylvania, and Illinois, *239 and in 1907 went to Gary, Indiana where he opened a barber shop which he operated for many years thereafter. He was married in 1911. After his wife gave birth to a son in 1913, she left him and went to Waco, Texas. She returned to Gary in 1916 but was pregnant at that time. They were divorced in 1918. Joseph then married Mary Montanio in 1918. She gave birth to a daughter, Vincenza, in June 1919. On June 19, 1923, Mary and Joseph were divorced. The court gave her the custody of Vincenza and ordered Joseph to pay $7 per week for Vincenza's support and maintenance until she reached 16 years of age. He made such payments only for a short time since he took over custody of Vincenza about a year after the divorce. The decedent, Salvatore Montagnino, came to the United States from Italy in 1909 or 1910 and commenced the operation of a shoe shop in the same building in which Joseph's barber shop was located. In 1910, Salvatore and Joseph pooled their earnings and purchased a lot at 1550 Massachusetts Street. [1] Title to the property was taken in Joseph's name. They made a down payment of $300, and the balance of the $1,500 purchase price was paid in installments. They constructed a one-story *240 building on the lot with borrowed money. Joseph made the arrangements for the purchase of the lot and construction of the building. In 1913 they sold the property for $5,000, and went to Italy. They returned to the United States later in the same year, repurchased the property for $5,000, and operated a barber shop and shoe shop in the building. Although arrangements for the repurchase of the property were made by Joseph, title was taken in Salvatore's name. In 1914 or 1915 they bought the adjacent lot, and had the building remodelled. The remodelled building consisted of two stories and a basement. There were two apartments on the second floor, two stores on the first floor in which Joseph and Salvatore operated their barber and shoe shops, and three rooms in back of the shops which they used for living quarters. They paid the indebtedness incurred in the construction of the building out of their earnings and rents received for the second-floor apartments. Joseph arranged for the rental of the apartments and collected the rent. In 1917, when Salvatore was overseas in the Army, Joseph again had the building remodelled so that it had four apartments on the second floor. In order to *241 get a loan from a building and loan association to finance the remodelling, Joseph had the property transferred into his name. During the nine months Salvatore was overseas, Joseph operated the barber shop and shoe shop and with the earnings realized from those sources and rental received, he paid $350 a month on the building and loan association loan. When Salvatore returned from the Army he again engaged in the shoe repair business, lived with Joseph in the apartment in the rear of the barber shop and shoe shop, and contributed his earnings toward paying off the loan on the building. Benamino Montagnino arrived in the United States from Italy in 1921. Joseph and Salvatore sent him to Chicago to learn to become a barber and when he returned to Gary he worked with Joseph in the barber shop and the three brothers lived together in the building. Mary Montanio, Joseph's second wife, also lived with them and did the house work during the period of approximately three years she was married to Joseph. Benamino's earnings were pooled with those of Joseph and Salvatore, and the earnings of *242 the three brothers and the rent received from the building at 1550 Massachusetts Street were deposited in an account at the American State Bank, 17th and Broadway, in Gary. Benamino and Joseph engaged in the barber business and Salvatore in the shoe repair business until 1939. In 1926 two buildings, one at 1634 Broadway and the other at 921 West 5th Avenue were purchased for $250,000. Joseph made the arrangements for the purchase and financing. The purchase price was paid as follows: (a) $35,000 in cash which had its source in the accumulated funds of the three brothers, (b) $65,000 in respect of the property at 1550 Massachusetts Street which was taken in trade; [2] and (c) the remainder out of the proceeds of first and second mortgage loans. The two buildings were rented and the mortgage indebtedness was subsequently paid with rent receipts and the earnings of the three brothers. In 1932, $20,000 was on deposit in a savings and loan association at 17th and Broadway in an account in Joseph's name. The funds in this account came from rental income and the earnings of the three brothers. The savings *243 and loan association went into receivership and liquidated its indebtedness on the account by conveying five parcels of real estate to Montanio Brothers, Inc., a corporation that was organized in 1933. The stock of that corporation was held equally by Salvatore, Joseph and Benamino up to July 3, 1956, and equally by Salvatore and Joseph from that date to 1960. After the corporation was formed lot 5, block 7, C.T.L. & I. Co's. 3rd addition, known as 1416 Broadway, was acquired by Joseph at a foreclosure sale for $10,000 which came from funds accumulated by the three brothers. Title to this property was taken in the name of Montanio Brothers, Inc. That corporation was dissolved in 1960, and the property at 1416 Broadway, which was the only property then owned by the corporation, was transferred by it to Joseph and Salvatore, as joint tenants, and was held in their names until the date of decedent's death. From 1939 to 1942, a department store located at 1636 Broadway was operated in the name of Montanio Department Store, Inc. The funds used to purchase the store, amounting to $7,500, came from the accumulated earnings of the three brothers and from rental income. Joseph was the manager *244 of the store, handled the money, did the buying, the hiring and firing of employees, and made some sales. Benamino sold shoes in the shoe department. Salvatore was not active in the operation of the store. In 1942, Montanio Department Store, Inc. was dissolved, but the store continued to engage in business under the management of Joseph during the years 1942 through 1949. Prior to July 1, 1956, a bank account was maintained in the names of Joseph, Benamino and Salvatore at the Gary National Bank and income from the operation of the department store, from the rental and sale of property, and from other sources was deposited in that account. During the years 1941 through 1954 funds in that account were used to purchase 14 parcels of real estate. Title to most of those properties was taken and held in Salvatore's name. In partnership returns filed by "Montanio Bros." for the years 1942 to 1956, the following income was reported: Gross Re-
ceipts
Gross
Gross
Other
Net
Profit
Dept.
Dept.
Interest
Rent
Income
Income
Store
Store
1942
$51,036.11
$ 7,461.21
$ 31.42
$ 5,756.25
$1,562.08
$ 4,574.73
1943
76,414.01
25,616.75
232.64
6,769.00
2,656.94
21,682.59
1944
86,167.92
27,378.63
377.79
8,031.05
4,352.10
23,405.46
* 1945
85,568.00
28,445.66
293.86
10,782.00
4,846.65
27,858.22
1946
59,273.59
18,147.53
754.73
17,491.30
2,942.43
14,374.55
1947
73,261.35
17,536.31
281.06
20,138.50
3,176.15
18,402.88
1948
70,081.99
15,702.08
1,020.58
28,819.44
3,949.52
15,162.91
* 1949
42,740.93
4,887.42
1,761.57
37,402.47
4,004.59
22,265.63
* 1950
3,295.71
45,833.50
1,208.23
25,337.08
1951
5,300.14
46,903.59
20,693.41
1952
8,224.51
53,004.30
32,886.28
1953
7,111.55
56,871.85
34,527.00
1954
7,553.03
58,463.50
31,208.24
1955
8,453.10
61,536.00
32,960.44
*245 In the partnership returns filed by "Montanio Bros." for the years 1942 through 1945 the persons listed as partners entitled to equal shares of the partnership net income were Joseph and Vincenza Montanio and Benamino and Salvatore Montagnino. Vincenza, Joseph's daughter, worked in the department store, and did not own an interest in the assets of the business. In partnership returns filed for the years 1946 through 1954, the decedent, Joseph and Benamino were listed as partners entitled to equal shares of the net income reported. In 1955, Teresa and Carmela Montagnino, sisters of the three brothers, came to the United States from Italy. In the partnership return filed for the year 1955 Teresa and Carmela and the three brothers were listed as partners entitled to equal shares of the net income reported. In 1955, Teresa and Carmela kept house for their brothers and did not own an interest in the assets of the business. In 1956 the three brothers had a quarrel and Benamino *246 decided to retire. On July 3, 1956, Joseph and Salvatore, as parties of the first part, and Benamino, as party of the second part, entered into the following agreement: WHEREAS, said parties heretofore have been engaged as a Partnership, sometimes known as MONTANIO BROTHERS; and WHEREAS, during said partnership said parties have accumulated assets, being real, personal and mixed assets; and WHEREAS, said parties have now decided to amicably dissolve said partnership; and WHEREAS, said parties have each contributed approximately equal assets toward the principal of said partnership assets; and WHEREAS, the parties have agreed upon the values of the respective real estate owned by said respective parties as a partnership, as well as the personalty and mixed property assets of said partnership; and WHEREAS, the parties have this day agreed to partition among themselves each equal sums evidenced by either real, personal or mixed properties, or property, of the said partnership, and have agreed to execute proper instruments effecting the transfer of the respective interests in the respective properties to each other as per agreement of partition, and have, contemporaneously *247 with the execution of this Agreement so executed same; and WHEREAS, primarily the said Second Party has severed his relations as a partner, and thus left JOSEPH MONTAGNINO and SALVATORE MONTAGNINO remaining as two partners, and who are to continue the partnership as to their respective assets, real, personal, or mixed; NOW, THEREFORE, In consideration of the receipt in partition of real, personal and mixed property, as evidenced by deeds to certain real estate and payments made to them, and the receipt of other personal property by the said Second Party, said Second party hereby waives all rights to share in the profits of said co-partnership under said co-partnership agreement as to any assets remaining in the said First Parties as a partnership. Thus, said Second Party having thereby received his equal distribution of the partnership assets of the said Partnership, all in accordance with an accounting and a showing having been had between the parties as to the true condition of their partnership business holdings and assets, the Parties hereto each separately and severally have agreed and do hereby agree that said partnership shall be determined, and that each has received *248 the respective amounts in all property, real, personal and mixed, due to each of them for his or her respective share in said partnership assets. THUS, This Indenture Witnesseth, that in pursuance of this said Agreement and in consideration of the premises as herein set out, the parties hereto dissolve said partnership as and from the 1st day of July, 1956, which partnership was heretofore subsisting between them in the business aforesaid. Since they do not have any creditors, no notice of said dissolution and of the intended discontinuance of their respective enterprises is necessary, and since they did not conduct any business wherein credit was involved, they deem it unnecessary to advertise or notify anyone of said dissolution. The parties hereto agree and they do hereby release each other and the continuing partners, Parties of the First Part, hereby respectively release the Parties of the Second Part from all actions, accounts, claims and demands in relation to said partnership hereby dissolved, and from all covenants, agreements, matters or things of whatsoever kind, nature or description. The parties hereby respectively agree that the realty hereby partitioned and deeded *249 to the respective parties contemporaneously with the execution of this agreement shall obligate the Grantees named in said deeds to assume and agree to pay all outstanding indebtednesses against the respective realty deeded to them and each of them pursuant to the within agreement; and that each of the said parties severally covenants with the other that each will duly pay and satisfy all debts and liabilities outstanding against the respective parcels of real estate received by each of the said partners in said voluntary partition. * * *
The share of the assets received by Benamino consisted of $74,676 in cash, three savings and loan accounts containing deposits of $10,302.25, $10,853.06 and $15,685.18, government bonds in the amount of $10,000, and two parcels of real estate located at 1637 Washington Street and 1634 Broadway. The title to 1634 Broadway had been held in Salvatore's name. After Benamino retired in 1956, a partnership composed of Joseph and Salvatore was formed and a checking account in the names of Joseph and Salvatore was opened at the Gary National Bank. Receipts from rent, interest, and sales of property were deposited in that account. The new partnership *250 acquired the real estate of the dissolved partnership which had not been distributed to Benamino. This real estate included properties at 1609 Maryland St. and 1073 Jefferson St. which were sold in 1958; properties at 701 West 17th Ave., 2272 Washington St. and 1220 W. 17th St. which were sold in 1959; property at 1641 Van Buren St. which was sold in 1960; and properties at 1328 Washington St., 1550 Massachusetts St., and 860 Broadway, title to which was recorded in decedent's name and held in his name until the date of his death. A parcel of real estate at 3531 Jefferson St. was purchased on July 16, 1956 and title was recorded in decedent's name and held in his name until his death. A parcel at 1416 Broadway was acquired from Montanio Bros., Inc. on May 27, 1960, and title to this property was recorded and held in the names of Salvatore and Joseph as joint tenants until the date of decedent's death. After the new partnership was formed in 1956, one $100,000 bearer U.S. Treasury four percent note, five $10,000 bearer U.S. Treasury four percent notes, seven $10,000 U.S. Treasury bonds, Series H, and one $5,000 U.S. Treasury bond, Series H, were purchased and paid for with checks drawn *251 on the account in the names of Joseph and Salvatore at the Gary National Bank. Funds in that account were also withdrawn and deposited in savings and loan accounts, ten of which were in Joseph's name, nine in Salvatore's name, and one in Joseph's name as trustee for Salvatore, at the time of decedent's death. In the partnership returns filed by "Montanio Bros." for the years 1956 through 1963 the following was reported: Gross
Ordinary
Long-Term
Interest
Rent
Net Income
Capital Gain
1956
$ 5,818.39
$61,453.15
$33,497.08
1957
8,852.27
51,060.00
33,452.00
1958
8,208.57
47,504.00
24,375.99
$10,036.88
1959
14,112.83
29,923.00
18,934.02
7,447.48
1960
13,411.51
27,471.50
21,335.03
28,161.63
1961
19,141.90
31,665.00
29,026.93
2,808.03
1962
13,961.22
26,055.00
19,863.07
3,164.37
1963 *
12,690.05
26,550.00
18,913.01
2,807.70
*252 In the individual income tax returns filed by or on behalf of Salvatore for the years 1957 through 1962 and by Joseph for the years 1957 through 1963 there was included in their taxable income one-half of the net income and one-fourth of the long-term capital gain reported in the partnership returns for those years. In the partnership return filed for 1956 the partners' shares of its net income were reported to be $13,186.22 each for Joseph and Salvatore and $7,124.64 for Benamino. In their individual returns for 1956 Joseph and Salvatore included in taxable income the amounts reported as their shares of partnership income in the partnership return for 1956. During the years prior to July 1, 1956, when the three brothers participated in the business venture, and during the years subsequent thereto and prior to decedent's death when the participants were Salvatore and Joseph, Joseph acted as manager, handled the funds, arranged for the purchase and financing of all properties acquired, decided in whose name the title to those properties would be recorded and held, rented the properties, and collected most of the rental income. The accountant who prepared the partnership returns *253 for the years 1942 through 1963 consulted Joseph in connection with their preparation and received from him all information concerning the business and its income. In the estate tax return filed for the estate of decedent the properties listed in Schedule E as "Jointly Owned Property", the values assigned therein to each of those properties on the date of decedent's death, and the amounts included in the gross estate as the value of decedent's interest in each property, were as follows: Amount
included in
gross
estate as
value of
decedent's
interest
(a)
Lots 17 and 18, Block 11, Gary Land Company's first
subdivision,
known as 860 Broadway (acquired on January 7, 1948, and
held in
decedent's name continuously until his death). Value
$35,000.00
$70,000
(b)
Resubdivision Lots 8 and 9, Block 4, Broadway Addition,
known
as 1550 Massachusetts Street (acquired on February 15,
1946, and
held in decedent's name continuously until his death).
Value
$50,000
25,000.00
(c)
Lot 6, Block F, Park Manor fifth subdivision, known as 3531
Jefferson Street (acquired on July 16, 1956, and held in
decedent's
name continuously until his death). Value $11,350
5,675.00
(d)
Lot 8, Block 16, C.T.L. & I. Co's. third addition, known as
1328 Washington Street (acquired on March 3, 1944, and held
in
decedent's name continuously until his death. Value $3,000
1,500.00
(e)
Lot 19 and the North One-half of Lot 20, Block 24, C.T.L. &
I Co's. sixth addition known as 2272 Washington Street
(acquired
in 1941 and held continuously in decedent's name
thereafter).
Property was sold to Morrissey in 1959 on land contract,
and
balance due on such land contract on date of decedent's
death
was $13,690.76
6,845.38
(f)
Lot 1, Resubdivision of Lots 1 to 5 and 42 to 46, Block 10,
Logan Park Addition to Tolleston, known as 701 West 17th
Avenue (acquired in 1944 and held continuously in
decedent's
name thereafter). Property was sold to Mayberry in 1959 on
land
contract, and balance due on such land contract on date of
dece-
dent's death was $10,543.47
5,271.73
(g)
Lot 31, Block 4, second Logan Park addition to Tolleston,
known
as 1220 West 17th Avenue (acquired in 1943 and held
continu-
ously in decedent's name thereafter). Property was sold to
Bynum in 1959 on land contract, and balance due on such
land
contract on date of decedent's death was $11,171.92
5,585.96
(h)
Lot 5, Block 7, C.T.L. & I: Co's third addition, known as
1416 Broadway (acquired on May 27, 1960 and held
continuously
in the names of decedent and Joseph Montanio as joint
tenants
until the death of decedent). Value $12,500
6,250.00
(i)
Lot 24, Block 3, C.T.L. & I. Co's. fourth addition, known
as
1073 Jefferson Street (acquired on August 13, 1951, and
held con-
tinuously in the name of Joseph Montanio thereafter).
Property
was sold to Andrews in 1958 on land contract, and balance
due on
such land contract on date of decedent's death $4,170.48
2,085.24
(j)
Savings and Loan Accounts in name of decedent each of which
had
a balance of $10,000 on date of his death.
Prospect Federal Savings & Loan of Chicago
5,000.00
Lincoln Federal Savings & Loan Association, Berwyn, Ill.
5,000.00
Berwyn Savings & Loan Association, Chicago
5,000.00
General Federal Savings & Loan Association, Chicago
5,000.00
Guardian Savings & Loan Association, Chicago
5,000.00
Lawn Savings & Loan Association, Chicago
5,000.00
First Mutual Savings Association, Chicago
5,000.00
Clyde Savings & Loan Association, Chicago
5,000.00
Crawford Savings & Loan Association, Chicago
5,000.00
Sterling Savings & Loan Association, Chicago
5,000.00
(k)
Savings and Loan Accounts in name of Joseph Montanio each
of
which had a balance of $10,000 on date of decedent's death.
Lincoln Federal Savings & Loan Association, Berwyn, Ill.
$ 5,000.00
Berwyn Savings & Loan Association, Chicago
5,000.00
General Federal Savings & Loan Association, Chicago
5,000.00
Guardian Savings & Loan Association, Chicago
5,000.00
Lawn Savings & Loan Association, Chicago
5,000.00
First Mutual Savings Association, Chicago
5,000.00
Clyde Savings & Loan Association, Chicago
5,000.00
Crawford Savings & Loan Association, Chicago
5,000.00
Sterling Savings & Loan Association, Chicago
5,000.00
(1)
U.S. Treasury $100,000 4% note, due 2/15/69. Value on date
of
decedent's death $101,312.50
50,656.25
Accrued interest to date of death $972.38
486.19
(m)
Five U.S. Treasury $10,000 notes due 10/1/69. Value on date
of
death $50,656.25
25,328.13
Accrued interest to date of death $234.97
117.49
(n)
Eight U.S. Treasury, Series H, Bonds, due 10/1/71, one in
the
amount of $5,000 and seven in the amount of $10,000 each,
total-
ling $75,000
37,500.00
(o)
Gary National Bank, Gary, Indiana. Checking account - $400
200.00
*254 The following were included in Schedule F of the estate tax return as "Other Miscellaneous Property": Amount included in
gross estate as
value of decedent's
interest
(p)
Household goods - total value $750
$ 375.00
(q)
Miscellaneous coins - value $25.00
12.50
In determining the deficiency the Commissioner did not make any change in the values on the date of decedent's death assigned in the estate tax return to each of the properties listed above in (a) through (n), (p) and (q). He determined, however, that the full value of each of the properties listed in (a) through (h), (j), (l) through (n), (p) and (q), was includable in decedent's gross estate in lieu of the amount which was included therein as the value of a one-half interest in each property. He also determined that the amount includable in decedent's gross estate for decedent's interest in the checking account at the Gary National Bank (item (o)) was $1,676.42, and that $10,000, the balance on the date of decedent's death in an account at the Prospect Federal Savings & Loan of Chicago in the name of Joseph Montanio as trustee for decedent, which was not reported in the estate tax *255 return, was includable in decedent's gross estate. In the deficiency notice the Commission states that if his determinations are upheld, additional exclusions from the taxable estate will be allowed in the amount of $45,000 with respect to the nine savings and loan accounts in the name of Joseph Montanio (item (k)), and in the amount of $2,085.24 with respect to the 1073 Jefferson Street property (item (i)). During the period July 2, 1956 to May 14, 1963, Salvatore Montagnino and his brother, Joseph, were engaged in business as partners and each owned a one-half interest in the assets and business of the partnership. Opinion RAUM, Judge: The principal issue relates to the various items in Schedule E ("Jointly Owned Property") of the estate tax return. The theory of the return and petitioner's theory before us is that the decedent and Joseph had pooled all their assets, that together they were equal members of a "partnership" in which all their assets were employed, and that such assets belonged to them in equal shares regardless of whether title was technically in one or the other of them or in their joint names. Accordingly, it is petitioner's position that only one-half of *256 the value of the various assets in the decedent's name and only one-half the value of the assets in the joint names of decedent and Joseph are includable in decedent's gross estate. And consistently, the estate tax return included as well one-half of the value of assets in Joseph's name. The Government, on the other hand, takes the position that the full value of the assets in the decedent's name is includable in the gross estate as his property, and that the full value of the assets in joint names must likewise be included in the gross estate under section 2040 of the 1954 Code. [3]
The problem is primarily one of fact, and the burden of proof is upon petitioner. The record before us is confused, and the principal witness, Joseph Montanio, was hardly one to inspire confidence. Nevertheless, we are reasonably satisfied on this record that petitioner's position is correct, that the decedent and his brother *257 in fact had an understanding whereby they pooled all their resources, that the various assets here involved were in fact purchased out of such pooled resources to which each brother contributed equally, that the decedent thus had only a one-half interest in the various assets standing in his name, and that the assets in joint names were acquired with funds in which each brother similarly had a one-half interest. In the circumstances, we conclude that the Commissioner erred in the adjustments whereby he attributed to the decedent the full value of the assets listed in Schedule E. Several comparatively minor adjustments remain to be disposed of. (a) Included in the jointly held property on the return was a checking account listed at $400, in respect of which $200 was included in the gross estate. The Commissioner increased this amount to $1,676.42. Petitioner has failed to produce any evidence proving that $1,676.42 was not the correct balance in that account. Accordingly, we must approve the Commissioner's determination as to the value of that account, but, since we have found that only one-half of the various assets in question belonged to the decedent, one-half of that amount, *258 or $838.21, should be included in (b) In determining the deficiency the Commissioner also included in the gross estate $10,000 which was in an account in a savings and loan association in the name of "Joseph Montanio as trustee for Salvatore Montagnino". This asset was not included in the estate tax return. Petitioner's evidence fails to show that decedent did not have an interest in this account, and we conclude that this asset, like the others, belonged to both brothers equally. We hold that one-half thereof is properly includable in the gross estate. (c) Finally, in Schedule F of the estate tax return ("Other Miscellaneous Property") there were listed Household goods having a value of $750, one-half of which, or $375, was included in the gross estate, and Miscellaneous coins, in which decedent's one-half interest was listed at $12.50. Here, too, the Commissioner took the position that the full value of these items should be included. The record in respect of these items is very skimpy. Yet, in view of the manner in which the decedent and Joseph conducted their lives, residing together and pooling their assets, we think that the return as filed should be accepted as correct as *259 to these items. Decision will be entered under Rule 50. Footnotes
1. All real estate transactions referred to herein involve property located in Gary, Indiana.↩
2. The building at 1550 Massachusetts Street was reacquired on February 15, 1946.↩
*. Net long-term capital gains from the sale of real estate were reported in the amount of $387.50 for 1945, and $5,527.42 for 1949, and from the sale of shoe shop equipment in the amount of $3,000 in 1950.↩
*. The final partnership return for 1963 filed by "Montanio Bros." on or about February 10, 1964 indicates that the amount of $12,690.05 represents interest of $2,700 on government obligations, interest of $7,564.57 on ten savings and loan association accounts in Salvatore's name and nine in Joseph's name, and interest of $2,425.48 on land contracts on the 1073 Jefferson, 701↩ West 17th, 2272 Washington, and 1220 West 17th properties.
3. This section requires inclusion of the full value of jointly held property except such part as may be shown to have originally belonged to the survivor and never to have been received by him from the decedent for less than an adequate consideration in money or money's worth.↩